**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VICKI SHROYER, as Administratrix of the Estate of BRADLEY ROBERT SHROYER,<br><br>Plaintiff,<br><br>v.<br><br>MHM CORRECTIONAL SERVICES, LLC (also known as MHM SERVICES, INC.)<br><br>and<br><br>CENTURION OF PENNSYLVANIA, LLC (also known as CENTURION DETENTION HEALTH SERVICES, INC. and/or CENTURION EQUITY, INC.)<br><br>and<br><br>REBECCA KLINK,<br><br>Defendants. | : | No. 26-CV-1714<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Vicki Shroyer ("Mrs. Shroyer"), as Administratrix of the Estate of Bradley Robert Shroyer ("Mr. Shroyer"), by her counsel, hereby files this Complaint as follows:

**Introduction**

1. This is a civil rights and wrongful death/survival action arising from the foreseeable and preventable suicide of Mr. Shroyer at SCI Fayette (defined *infra*), who died by suicide on August 16, 2024, after Centurion (defined), a private corporation, and its behavioral health specialist, Klink (defined *infra*), repeatedly ignored well-documented, acute, and chronic suicide risk factors, including elevated psychological risk-assessment scores, a documented history of suicidal ideation during prior placement in solitary confinement, the destabilizing stress of his impending release after years of incarceration, and, in his final days, his preparation of letters of

apology to his family, a recognized hallmark warning sign of imminent self-harm, and left him isolated and unsupervised in the RHU without any suicide risk assessment, individualized treatment plan, or heightened observation. One hour after Klink's last, cursory contact with him, Mr. Shroyer was found hanging in his cell. Plaintiff brings this action under 42 U.S.C. § 1983 for deliberate indifference to Mr. Shroyer's serious medical needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution, and under Pennsylvania common law for corporate and individual medical negligence resulting in wrongful death and conscious pain and suffering.

**Parties**

2. Mrs. Shroyer is an adult individual residing in Pennsylvania.

3. Defendant MHM Correctional Services, LLC is a foreign limited company with a business registration in Delaware and principal and registered place of business at 21251 Ridgetop Cir Ste 150, Sterling, Virginia 20166-6645. Upon information and belief, Defendant MHM Correctional Services, LLC is formerly known as MHM Services, Inc. Upon information and belief, Defendant MHM Correctional Services, LLC is now operating as Defendant Centurion of Pennsylvania, LLC and/or Centurion Detention Health Services, LLC and/or Centurion Equity, Inc. with a principal and registered place of business at 21251 Ridgetop Cir Ste 150, Sterling, Virginia 20166-6645. MHM Correctional Services, LLC, MHM Services, Inc., Centurion of Pennsylvania, LLC, Centurion Detention Health Services, LLC, and Centurion Equity, Inc. are collectively referred to herein as "Centurion."

4. At all relevant times, Centurion was acting by and through its duly authorized employees, agents and/or administrators, who at all relevant times were acting within the course and scope of their employment, under color of state law, and in accordance with its policies, practices, and customs. At all relevant times, Centurion contracted with the Pennsylvania Department of Corrections ("DOC") to provide inmate mental health/psychiatric services to its DOC facilities,

including but not limited to State Correctional Institution Fayette ("SCI Fayette"). Under contract, Centurion was responsible for adopting, implementing, and enforcing policies and procedures for psychiatric and behavioral health care for inmates at DOC facilities.

5. At all relevant times, all psychiatrists, behavioral health specialists, and other healthcare personnel who observed, cared for and/or treated Mr. Shroyer at SCI Fayette were the agents, ostensible agents, servants, representatives, and/or employees of Centurion, and were acting while in and upon the business of Centurion and while in the course and scope of their employment. The professional liability claims asserted against Centurion are for the professional negligence of all its actual, apparent, and/or ostensible agents, servants and employees who participated in the care, treatment, management, and clinical decision-making for Mr. Shroyer at SCI Fayette. The professional liability claims being asserted against them include direct claims for corporate negligence. Centurion had actual or constructive notice of the actions of its agents, ostensible agents, servants, representatives, and/or employees.

6. At all relevant times, Defendant Rebecca Klink ("Klink") was employed by Centurion as a behavioral health specialist to provide mental health care at SCI Fayette. At all relevant times, Klink acted under color of state law, in the scope of her employment and in accordance with policies, practices and customs of Centurion. At all relevant times, Klink was responsible for providing mental health care to inmates like Mr. Shroyer. Klink is sued in her individual capacity.

**Jurisdiction and Venue**

7. This action is brought pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments of the United States Constitution. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4). This Court has supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because each claim arose in the Western District of Pennsylvania.

**Factual Background**

9. At all relevant times, Mr. Shroyer was serving an aggregated term of incarceration of 8 to 16 years within the Pennsylvania Department of Corrections ("DOC") for drug related offenses, where he was housed at the State Correctional Institution – Fayette ("SCI Fayette").

10. Mr. Shroyer had a litany of documented psychiatric disorders.

11. At all relevant times, Centurion knew or should have known that Mr. Shroyer rated at significantly elevated scales for antisocial features, which are strongly linked to an increased risk of suicide attempts and self-harm because of high impulsivity, low behavioral restraint, high negative emotionality, and substance abuse.

12. At all relevant times, Centurion knew or should have known that Mr. Shroyer was diagnosed with severe substance abuse disorder (including severe opioid abuse disorder), depressive disorder, adjustment disorder with anxiety, and insomnia disorder.

13. At all relevant times, Centurion knew or should have known that Mr. Shroyer rated at significantly elevated scales under psychological testing for CSS-M (used to measure antisocial attitudes, values, and beliefs related to criminal behavior), LSI-R (used to measure the likelihood for recidivism), PAI-ANT (used to measure traits related to antisocial personality disorder), PAI-VPI (used to measure aggression, physical dangerousness, and violence), RST (used to measure biological drive), and TCU (used to measure an individual's behavioral patterns and thinking styles).

14. Significantly elevated and high scores across the CSS-M, LSI-R, PAI-ANT, PAI-VPI, RST, and TCU are statistically related to an increased risk of suicide:

a. CSS-M: High scores show deeply entrenched antisocial attitudes and hostility toward authority, which is a mindset that heavily co-occurs with feelings of hopelessness and unaddressed severe mental illness, both of which are strong clinical predictors of suicide.

b. LSI-R: High scores indicate severe distress across dynamic lifestyle areas, including unstable housing, family breakdown, financial ruin, and substance abuse, the high accumulation of which significantly lowers an individual's resilience during an immediate emotional crisis.

c. PAI-ANT: High impulsivity dramatically changes how a person handles suicidal thoughts, making them much more likely to act instantly on a self-destructive urge rather than navigating the crisis safely.

d. PAI-VPI: A high VPI score indicates a strong predisposition toward outward aggression. Clinical data shows a high overlap between the VPI and the PAI's Suicide Potential Index (SPI) because individuals with poor emotional regulation frequently turn their outward aggression inward when facing trapped or hopeless situations.

e. RST: Under the biological model, an unbalanced profile featuring a highly active reward system (high impulsivity) paired with a highly reactive threat system (high anxiety) creates a dangerous mix of intense psychological pain and a complete lack of behavioral constraint. Under the forensic model (RSTI), high danger coupled with low treatment amenability marks individuals who struggle to cope constructively with legal crises.

f. TCU: High scores on the Criminal Thinking Scales (TCU CTS) paired with a severe rating on the TCU Drug Screen point to severe cognitive distortions and active addiction. Substance abuse drastically lowers natural inhibitions, causing acute spikes in immediate suicide attempts during moments of high distress.

15. At all relevant times, Centurion knew or should have known that Mr. Shroyer suffered acute psychiatric symptoms from housing placement in the Restricted Housing Unit (“RHU”), which is otherwise referred to as solitary confinement wherein the incarcerated person is housed within a cell with constant light and a lack of mental stimulation for at least 23 hours per day.

16. At all relevant times, Centurion knew or should have known that RHU housing placement substantially exacerbated Mr. Shroyer's psychiatric symptoms relating to anxiety, panic, impulsivity, and depression.

17. At all relevant times, Centurion knew or reasonable should have known that Mr. Shroyer expressed suicidality and was "sad and made a statement about killing himself" during prior placement into the RHU.

18. At all relevant times, Centurion listed Mr. Shroyer's "Warning Signs and Symptoms of Potential Safety Concerns" as, among other things, "substance abuse, medication noncompliance, isolation/withdrawal, RHU placement and misconducts, impulsive behaviors, and boredom."

19. At all relevant times, Centurion knew or should have known that Mr. Shroyer's past and present use of illicit substances substantially exacerbated Mr. Shroyer's psychiatric symptoms relating to anxiety, panic, impulsivity, and depression.

20. At all relevant times, Centurion knew or should have known that changes in circumstances in Mr. Shroyer's life substantially exacerbated Mr. Shroyer's psychiatric symptoms relating to anxiety, panic, impulsivity, and depression.

21. At all relevant times, Centurion knew or should have known that Mr. Shroyer's release (or the prospect of his release) substantially exacerbated Mr. Shroyer's psychiatric symptoms relating to anxiety, panic, impulsivity, and depression.

22. For example, at all relevant times, Centurion knew or should have known that each time that Mr. Shroyer had been released on parole while incarcerated in 2021 and 2022, he almost immediately began using illicit substances and walked off or failed to report to his treatment centers.

23. This conduct created family stressors and engrained hopelessness that he would never be able to successfully reenter society and reconcile with his family, which substantially

exacerbated Mr. Shroyer's psychiatric symptoms relating to anxiety, panic, impulsivity, and depression.

24. This conduct also reintroduced severe substance abuse into his life that engrained hopelessness in him since he first became addicted to illicit substances around age 12.

25. At all relevant times, Centurion knew or should have known that Mr. Shroyer had at least identifiable chronic suicide risk factors relating to:

a. Chronic mental illness,

b. Prison sentence of at least 10 years or more,

c. History of psychiatric treatment,

d. History of substance abuse,

e. Male,

f. Older than 35 years of age, and

g. Minimal education.

26. Despite the foregoing, Centurion did not actively manage Mr. Shroyer's psychiatric disorders or prepare an adequate treatment plan for those disorders while he was incarcerated to address situations where he was faced with known stressors and triggers like RHU placement and changes in his circumstances.

27. Any psychiatric or behavioral health care provided to Mr. Shroyer during his years of incarceration within the DOC and at SCI Fayette by Centurion consisted of less than a few minutes of cell-side interviews once every few months.

28. Moreover, even though Mr. Shroyer engaged in more than a dozen misconducts for things like substance abuse while incarcerated, Centurion failed to adequately examine him in relation to his risks and psychiatric disorders.

29. On the contrary, Centurion started and stopped Mr. Shroyer's psychiatric medications during his incarceration despite repeated conduct establishing his psychiatric disorders while unmedicated during incarceration.

30. At all relevant times, Centurion knew or reasonably should have known that Mr. Shroyer repeatedly experienced acute emotional distress during incarceration, particularly when facing custody changes, disciplinary consequences, and relationship stress.

31. Despite everything, Mr. Shroyer was granted parole on or about July 24, 2024, with a release date of August 21, 2024.

32. At the time of his expected release, Mr. Shroyer had $0.06 in his bank account, owed tens of thousands of dollars in court costs, fines, and restitution payments, and did not have a job or job prospects upon his release.

33. At all relevant times, Centurion knew or should have known that:

a. Mr. Shroyer previously voiced his concerns that if he became incarcerated again, or remained substance-dependent, he would forever lose the opportunity to reconcile with his wife and children,

b. Mr. Shroyer had severe adjustment disorder with reentry,

c. Mr. Shroyer showed a history for substantially exacerbating Mr. Shroyer's psychiatric symptoms relating to anxiety, panic, impulsivity, and depression upon release or the prospect of release, and

d. Mr. Shroyer reported feeling depressed even when there are positive events in his life, and that his depression stemmed from long-term use of methamphetamines while in the community.

34. On or about August 9, 2024, because of his impending release, Mr. Shroyer began "acting erratically on the block," and thereafter he was placed into a Primary Observation Cell ("POC") for 23 hours.

35. Mr. Shroyer's anxiety, impulsivity, and erratic behavior was directly related to his impending release and reentry into the community, where he so often failed before.

36. A day later, on or about August 10, 2024, Mr. Shroyer was placed into the RHU.

37. RHU housing always substantially exacerbated Mr. Shroyer's psychiatric symptoms relating to anxiety, panic, impulsivity, and depression.

38. Centurion recorded acute suicide risk factors such as RHU housing placement, single cell status in the RHU (i.e., no cellmate), recent housing change, lack of psychotropic medication, and lack of suicide precautions.

39. Shortly after being housed in the RHU, Mr. Shroyer was found suffering from a panic attack, yet Centurion failed to adequately examine him in relation to his acute psychiatric disorders and the risks (such as suicide) they posed.

40. Also, shortly after being housed in the RHU, Centurion received reports that Mr. Shroyer was intoxicated on illicit substances while incarcerated.

41. No investigation was carried out to understand where, when, how, or why Mr. Shroyer was taking illicit substances on the eve of his impending release.

42. In response, Centurion (through Klink) only spoke with Mr. Shroyer at his cell door in the RHU for less than four minutes, entirely ignoring his panic attacks, illicit use of substances, and anxiety.

43. Centurion did not examine or evaluate Mr. Shroyer prior to or during his placement into the RHU, even though he was reported to have been acting erratically, impulsively, and was under the influence of illicit substances.

44. Centurion did not provide Mr. Shroyer with any enhanced protection.

45. A reasonable official confronted with Mr. Shroyer's risk factors would have taken additional preventive steps, including closer observation, suicide precautions, removal of ligature opportunities, medication review, and more intensive mental-health intervention; Defendants did not do so.

46. Centurion showed repeated institutional recognition that RHU placement, misconducts, isolation, boredom, lack of medication, and housing changes were suicide-warning signs or acute risk factors, yet those very circumstances were allowed to persist without suicide watch or materially heightened intervention in Mr. Shroyer's case.

47. For instance, while only about 5 percent of the DOC's incarceration population is in solitary confinement at any given time, Centurion knew that approximately 40 percent of suicides and suicide attempts in the DOC occur on solitary confinement units.

48. Centurion knew that the conditions in the RHU generate the need for mental health treatment even in individuals with no history of mental health treatment, let alone those individuals with a history of the same.

49. Centurion knew that solitary confinement poses conditions of confinement that create or worsen predictable adverse psychological symptoms, including those specifically attributed to individuals like Mr. Shroyer who suffers from uncontrollable anxiety, impaired impulse control, and depression.

50. On August 16, 2024, Mr. Shroyer's conduct became more erratic in the RHU.

51. Despite his impending release in one week (after years of incarceration), Mr. Shroyer asked Klink for paper and envelopes so that he could write letters of apology to his family.

52. At all relevant times, Centurion (and Klink) knew or reasonably should have known that Mr. Shroyer's risk mitigators were his family, and that his housing placement upon release was with his family; nevertheless, he asked Klink for papers and envelopes to write letters of apology to the very support system he was expected to see and stay within in less than one week.

53. At the same time, Mr. Shroyer reported to Centurion (and Klink) that he had serious personal issues occurring with his family, like the threat of his wife leaving him with his children if he failed his reentry as he had done so many times in the past.

54. The letters of apology were acute signs of suicidality and clear "goodbye letters."

55. Neither Klink nor any other behavioral health specialists at SCI Fayette for Centurion prepared a treatment plan, examined or evaluated, or otherwise cared for Mr. Shroyer despite his symptoms of acute suicidality.

56. Centurion (and Klink) knew or reasonably should have known that Mr. Shroyer was acutely suicidal, yet neither examined or evaluated Mr. Shroyer's suicidality and instead left him in the RHU without a treatment or observation plan.

57. Despite his psychiatric history, high risk of suicide, and/or symptoms of acute suicidality, Centurion (and Klink) housed Mr. Shroyer alone in the RHU with the means and opportunity to attempt and/or complete suicide while he was acutely suicidal.

58. One hour after Centurion (and Klink) left Mr. Shroyer in the RHU on August 16, 2024, he was found hanging from a torn bed sheet that he used as a ligature around his neck and tied to the end of the bed rail.

59. Mr. Shroyer was deceased.

60. No observation rounds were adequately conducted for Mr. Shroyer.

61. When Mr. Shroyer was found, he was already in the late stages of cyanosis, meaning a visible bluish-purple coloration appeared across his lips, ears, and facial skin because of oxygen deprivation over a significant period during which no cell observation rounds were adequately conducted, notwithstanding his acute suicidality and the acute and chronic risk factors known to Defendants.

## Count I

## Failure to Adopt Policy or, in the Alternative, Failure to Train or Supervise, Pursuant to 42 U.S.C. § 1983

## (Against Centurion)

62. All paragraphs herein are incorporated by reference.

63. Centurion inflicted unnecessary and wanton pain upon Mr. Shroyer by failing to adopt a policy or procedure for assessing the suicide risk of inmates, including those inmates housed in the RHU.

64. Centurion failed and/or refused to adopt suicide risk assessment policies in at least the following ways:

a. Failing to establish procedures and protocols to identify suicidal inmates,

b. Failing to establish procedures and protocols for suicide precautions,

c. Failing to establish procedures and protocols for prompt evaluation of suicidal inmates, when identified and/or indicated,

d. Failing to establish procedures and protocols for suicide intervention,

e. Failing to establish procedures and protocols for suicide monitoring,

f. Failing to establish procedures and protocols for individualized treatment plans addressing both risk-enhancing and protective factors,

g. Failing to establish procedures and protocols for mental health patient follow-ups,

h. Failing to establish procedures and protocols for patients who express suicidal ideation without a specific threat or plan,

i. Failing to establish procedures and protocols for reducing the risk of suicide among the inmate population,

j. Failing to establish procedures and protocols for suicide risk assessments upon admission, after legal issues/problems, after receipt of bad news, after admission to segregation and/or single-cell housing,

k. Failing to establish procedures and protocols for establishing suicide risk management plans,

l. Failing to establish procedures and protocols for intake, screening, identifying, and supervision of acute and nonacute suicidal inmates,

m. Failing to establish procedures and protocols for monitoring clothing for potentially suicidal inmates,

n. Failing to establish procedures and protocols for monitoring housing for potentially suicidal inmates,

o. Failing to establish procedures and protocols to adequately assess an inmate's suicide risk, thereby depriving them of identification, treatment, and management of suicide risk,

p. Failing to establish procedures and protocols for comprehensive psychiatric evaluations,

q. Failing to establish procedures and protocols for identifying risk factors and overall degree of suicidality,

r. Failing to establish procedures and protocols as adequate safeguards and safety precautions against the risks of suicide,

s. Failing to establish procedures and protocols for individualized treatment interventions designed to reduce the patient's suicide risk,

t. Failing to establish procedures and protocols that do not rely solely on the inmate's denial of suicidal intent, and

u. Failing to establish procedures and protocols for systematic assessment of suicide risk.

65. The failure to adopt any such policy caused Mr. Shroyer not to have any adequate safety precautions implemented for his protection or to have any individualized treatment plan implemented to reduce his suicide risk.

66. The failure to adopt any such policy shows deliberate indifference to any inmate who is particularly vulnerable to suicide because of a serious mental health condition when he or she is under the care and custody of Centurion and was the moving force behind Mr. Shroyer's death.

67. Alternatively, Centurion inflicted unnecessary and wanton pain upon Mr. Shroyer by failing to train their agents, employees, and/or assigns on at least the following:

a. Identifying suicide risk factors,

b. Identifying suicide warning signs and symptoms,

c. Identifying suicidal ideations,

d. Removing means and opportunities for potentially suicidal inmates,

e. Implementing appropriate observation upon potentially suicidal inmates,

f. Communicating between correctional and health care personnel on responding to concerns over potentially suicidal inmates,

g. Timely responses to mental health referrals,

h. Utilizing suicide risk assessments,

i. Implementing individualized treatment plans,

j. Identifying risk-enhancing and protective factors,

k. Evaluating inmates for suicidality,

l. Providing comprehensive psychiatric evaluations, and

m. Following-up and/or monitoring potentially suicidal inmates.

68. Alternatively, Centurion inflicted unnecessary and wanton pain upon Mr. Shroyer by failing to supervise their agents, employees, and/or assigns in at least the following ways:

a. By inadequately staffing behavioral health specialists,

b. By intentionally understaffing behavioral health specialists within the DOC when a significant portion of the inmate population suffered from mental illness,

c. By failing to implement and/or enforce policies concerning suicide risk assessments and suicidality, generally,

d. By failing to ensure adequate follow-ups and treatment plans for suicidal inmates,

e. By failing to ensure adequate psychiatric evaluations over suicidality, and

f. By failing to ensure appropriate housing and clothing is afforded to suicidal inmates.

69. Mr. Shroyer's death would have been avoided had Centurion adequately trained and/or supervised their agents, employees, and/or assigns on providing adequate suicide risk assessments.

**Count II**

**Denial and Delay of Access to Adequate Medical Care**
**Pursuant to 42 U.S.C. § 1983**

**(Against Klink)**

70. All paragraphs herein are incorporated by reference.

71. As alleged above, Klink was directly and repeatedly confronted with Mr. Shroyer's documented history of suicidal ideation, his elevated risk-assessment scores, and his preparation of goodbye letters to his family in the days before his death, and yet she conducted only a cursory final contact with him roughly one hour before he was found hanging, without ordering heightened observation, a safety plan, or any escalation of his level of care.

72. Mr. Shroyer's chronic and acute psychiatric symptoms constituted a serious medical need of which Klink was subjectively aware, and her failure to provide any meaningful treatment, monitoring, or intervention in response was objectively unreasonable and causally connected to his death.

73. Klink exhibited deliberate indifference to Mr. Shroyer's serious medical needs by inflicting unnecessary and wanton pain upon him in that she denied and/or delayed appropriate mental health treatment, including an adequate suicide risk assessment, in a way that patently offends the evolving standards of decency for which he was constitutionally protected to enjoy by,

among other things, knowing his particular vulnerability to suicide but intentionally failing and/or refusing to do any or all of the following:

a. Assess suicide risk,

b. Manage suicide risk,

c. Identify suicide risk factors,

d. Identify overall degree of suicidality,

e. Implement adequate safety precautions and safeguards,

f. Implement individualized treatment interventions,

g. Screen for suicidality,

h. Perform evaluations at clinically relevant or critical times,

i. Perform comprehensive mental health evaluations on suicidality,

j. Consider both risk-enhancing and protective factors,

k. Document decisions and/or reasons for choosing or not choosing any particular type of intervention, treatment, and/or assessment,

l. Explore suicidal ideation, behavior, planning, desire, and/or intent,

m. Rely on information other than his own denial of suicidal intent, and

n. Assess the degree and intensity of his suicidal ideations.

**Count III**

**Corporate Medical Negligence (Wrongful Death)**

**(Against Centurion)**

74. All paragraphs herein are incorporated by reference.

75. At all relevant times, Centurion owed the following non-delegable duties to Mr. Shroyer:

a. The duty to use reasonable care in the maintenance of safe and adequate facilities and equipment,

b. The duty to select and retain only competent physicians and nurses,

c. The duty to oversee all persons who practice medicine and nursing within its walls as to patient care, and

d. The duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the patients.

76. Mr. Shroyer relied upon Centurion to uphold these duties.

77. Centurion violated these duties in at least the following ways:

a. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel to identify suicidal inmates,

b. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel to implement or idenitfy suicide precautions,

c. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for prompt evaluation of suicidal inmates, when identified and/or indicated,

d. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for suicide intervention,

e. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for suicide monitoring,

f. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for individualized treatment plans addressing both risk-enhancing and protective factors,

g. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for mental health patient follow-ups,

h. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for patients who express suicidal ideation without a specific threat or plan,

i. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for reducing the risk of suicide among the inmate population,

j. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for suicide risk assessments upon admission, after legal issues/problems, after receipt of bad news, after admission to segregation and/or single-cell housing,

k. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for establishing suicide risk management plans,

l. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for intake, screening, identifying, and supervision of acute and nonacute suicidal inmates,

m. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for monitoring clothing for potentially suicidal inmates,

n. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for monitoring housing for potentially suicidal inmates,

o. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel to adequately assess an inmate's suicide risk, thereby depriving them of identification, treatment, and management of suicide risk,

p. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for comprehensive psychiatric evaluations,

q. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for identifying risk factors and overall degree of suicidality,

r. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel to implement adequate safeguards and safety precautions against the risks of suicide,

s. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for individualized treatment interventions designed to reduce the patient's suicide risk,

t. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel so that reliance of suicidal intent is not based solely on the inmate's denial of the same, and

u. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for systematic assessment of suicide risk.

78. Centurion also violated these duties by, among other things:

a. Failing to identify suicide risk factors,

b. Failing to identify suicide warning signs and symptoms,

c. Failing to identify suicidal ideations,

d. Failing to remove means and opportunities for potentially suicidal inmates,

e. Failing to implement appropriate observation upon potentially suicidal inmates,

f. Failing to communicate between correctional and health care personnel on responding to concerns over potentially suicidal inmates,

g. Failing to provide timely responses to mental health referrals,

h. Failing to utilize suicide risk assessments,

i. Failing to implement individualized treatment plans,

j. Failing to identify risk-enhancing and protective factors,

k. Failing to evaluate inmates for suicidality,

l. Failing to provide comprehensive psychiatric evaluations, and

m. Failing to follow-up and/or monitor potentially suicidal inmates.

79. Centurion further violated these duties by, among other things:

a. inadequately staffing behavioral health specialists,

b. intentionally understaffing behavioral health specialists at SCI Fayette when a significant portion of the inmate population suffered from mental illness,

c. failing to implement and/or enforce policies concerning suicide risk assessments and suicidality, generally,

d. failing to ensure adequate follow-ups and treatment plans for suicidal inmates,

e. failing to ensure adequate psychiatric evaluations over suicidality, and

f. failing to ensure appropriate housing and clothing is afforded to suicidal inmates.

80. Centurion's negligence increased the risk of harm to Mr. Shroyer.

**Count IV**

**Vicarious Liability (Wrongful Death)**

**(Against Centurion)**

81. All paragraphs herein are incorporated by reference.

82. Centurion is vicariously liable for the acts, commissions, or omissions of Klink, and others who acted and/or failed to act as though Centurion performed the acts or failed to perform the acts itself.

83. Centurion is responsible for at least the following negligent acts or omissions of its medical staff, who are their respective agents, ostensible agents, servants, and/or employees, which deviated from the medical standard of care owed to Mr. Shroyer in some or all the following ways:

a. Failing to assess suicide risk,

b. Failing to manage suicide risk,

c. Failing to identify suicide risk factors,

d. Failing to identify overall degree of suicidality,

e. Failing to implement adequate safety precautions and safeguards,

f. Failing to implement individualized treatment interventions,

g. Failing to screen for suicidality,

h. Failing to perform evaluations at clinically relevant or critical times,

i. Failing to perform comprehensive mental health evaluations on suicidality,

j. Failing to consider both risk-enhancing and protective factors,

k. Failing to document decisions and/or reasons for choosing or not choosing any particular type of intervention, treatment, and/or assessment,

l. Failing to explore suicidal ideation, behavior, planning, desire, and/or intent,

m. Failing to rely on information other than his own denial of suicidal intent, and

n. Failing to assess the degree and intensity of his suicidal ideations.

84. Klink's (and other employees, agents, and/or assigns of Centurion) negligence increased the risk of harm to Mr. Shroyer and was a cause in fact to the injuries he suffered and his resultant death, as set forth in detail in this Complaint.

**Count V**

**Medical Negligence (Wrongful Death)**

**(Against Klink)**

85. All paragraphs herein are incorporated by reference.

86. At all relevant times, Klink owed a duty to Mr. Shroyer to ensure his safety and care at SCI Fayette, yet she violated this duty in at least the following ways:

a. Failing to assess suicide risk,

b. Failing to manage suicide risk,

c. Failing to identify suicide risk factors,

d. Failing to identify overall degree of suicidality,

e. Failing to implement adequate safety precautions and safeguards,

f. Failing to implement individualized treatment interventions,

g. Failing to screen for suicidality,

h. Failing to perform evaluations at clinically relevant or critical times,

i. Failing to perform comprehensive mental health evaluations on suicidality,

j. Failing to consider both risk-enhancing and protective factors,

k. Failing to document decisions and/or reasons for choosing or not choosing any particular type of intervention, treatment, and/or assessment,

l. Failing to explore suicidal ideation, behavior, planning, desire, and/or intent,

m. Failing to rely on information other than his own denial of suicidal intent,

n. Failing to assess the degree and intensity of his suicidal ideations,

o. Failing to seek assistance, input, and/or direction from a medical professional other than herself, and

p. Failing to act for the safety, medical monitoring, and clinical care of the patient.

87. Klink's negligence increased the risk of harm to Mr. Shroyer and was a cause in fact to the injuries he suffered and his resultant death, as set forth in detail in this Complaint.

**Count VI**

**Corporate Medical Negligence (Survival)**

**(Against Centurion)**

88. All paragraphs herein are incorporated by reference.

89. For all the reasons identified in Count III above, Centurion's negligence increased the risk of harm to Mr. Shroyer.

**Count VII**

**Vicarious Liability (Survival)**

**(Against Centurion)**

90. All paragraphs herein are incorporated by reference.

91. For all the reasons identified in Count IV above, Klink's negligence increased the risk of harm to Mr. Shroyer.

**Count VIII**

**Medical Negligence**

**(Against Klink)**

92. All paragraphs herein are incorporated by reference.

93. For all the reasons identified in Count V above, Klink's negligence increased the risk of harm to Mr. Shroyer.

**Prayer for Relief**

WHEREFORE, Plaintiff respectfully requests that judgment be entered in her favor and against Defendants as follows:

(i) Actual and special damages as to all Counts,

(ii) Compensatory damages as to all Counts,

(iii) Punitive damages as to all Counts,

(iv) Attorney's fees and costs as to Counts I and II, and

(v) All other relief as this Court deems just and proper.

Respectfully submitted,

O'BRIEN COLEMAN & WRIGHT, LLC

/s/ Alec B. Wright
Alec B. Wright
Pa. ID No. 316657

116 Boulevard of the Allies
Pittsburgh, Pennsylvania 15222

(412) 260-1662
abw@obrienlawpgh.com

*Counsel for Plaintiff*